## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

DOMENIC VINCI,

              Plaintiff,

  v.

RONALD QUAGLIANI,
LISA WHITNEY YARBOR,
THOMAS GALLAGHER,
ALEX BOTTE,
GRACE HENDRICKS, and
RICHARD SMITH,

              Defendants.

3:08-cv-01935 (CSH)

## RULING ON DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

__HAIGHT, Senior District Judge:__

### I.    Introduction and Summary of Facts

Plaintiff Domenic Vinci, a public employee, brings this action against Ronald Quagliani, Lisa Whitney Yarbor, Thomas Gallagher, Alexander Botte,[1] Grace Hendricks, and Richard K. Smith ("Defendants") in their individual capacities. Plaintiff alleges a First Amendment claim based upon actions and events which Plaintiff claims constituted employment retaliation for constitutionally protected activity, specifically Plaintiff's freedoms of speech and association.[2] Defendants now make

---

[1] Alexander Botte passed away in 2010, and is no longer a Defendant in this action. In February of 2010, a suggestion of death was filed with the Court. In July of 2010, Robert E. Buckhold, Jr., a representative of Botte's estate, was added as a Defendant in Botte's stead.

[2] The Court notes that while it finds Plaintiff's claims to be primarily related to Plaintiff's freedom of speech as they concern his public support for a particular political candidate, rather

1

a Motion for Summary Judgment [Doc. 27], seeking a summary disposition of all claims Plaintiff alleges in his Amended Complaint [Doc. 30].  For the reasons given below, summary judgment against those claims is appropriate.

A number of facts are undisputed.  Plaintiff was at all times relevant to this action a police officer employed by the City of West Haven.  At the time he filed his Amended Complaint, he had been a member of the West Haven Police Department (hereafter the "Department") for eighteen years.  The Plaintiff also served on the West Haven Democratic Town Committee (hereafter the "Democratic Town Committee" or the "Committee"), which he apparently joined in the spring of 2005.  At all times relevant hereto, Quagliani was the Chief of Police of the Department, and at various relevant times Yarbor, Gallagher, Botte, Smith, and Hendricks were members of the West Haven Board of Police Commissioners (the "Board").

Plaintiff avers that in the spring of 2005, together with fifty-three other members of the Democratic Town Committee, he endorsed John Picard as candidate for mayor of West Haven.  As a result of this vote, the Committee refused to endorse the incumbent, Richard Borer, despite the fact that Borer was a member of the Democratic party.  Although Borer did not receive his party's backing for reelection, he nonetheless ran for mayor as an independent.  Borer was defeated by

_____

than his freedom of association, to the extent that his claims encompass the latter, i.e., to the extent that Plaintiff is also claiming that he was retaliated against due to his association with the local political committee in which he voted for a mayoral candidate or his association with the candidate's candidacy itself, the Court notes that the standards by which a court is to evaluate claims premised upon a retaliation for either reason are the same.  *See, e.g., Cobb v. Pozzi*, 363 F.3d 89, 104-5 (2d Cir. 2004) ("We see nothing ... that would limit the public concern requirement to First Amendment claims based on free speech, as opposed to claims premised on other forms of First Amendment expression, and we are not alone in that observation.") (citations omitted).  For convenience, the Court will on occasion refer to Plaintiff's actions as "speech" in this opinion.

Picard in 2005. Plaintiff claims, without providing significant evidence to support his assertions, that Defendants remained loyal to Borer once Picard became mayor. Plaintiff also claims, without offering evidence outside his own testimony, that he was warned that his support for Picard might have negative consequences at work. After the election, Plaintiff claims that the Defendants jointly and severally "engaged in a campaign to harass, intimidate and punish" Plaintiff for Plaintiff's opposition to Borer's candidacy. [Doc. 30] at 2-4.

Plaintiff claims that prior to the 2005 mayoral election, he had enjoyed an unblemished career as a West Haven police officer. He had been appointed to the rank of detective in 2003, and at that time he was assigned to the Special Victims Unit of the Department (hereafter the "SVU"). He was still working in the SVU when in March 2005 he applied for and obtained a position as a School Resource Officer/Youth Officer for West Haven High School. Although Plaintiff was taking on a new role with West Haven High School, he reportedly agreed to finish the still-active SVU cases to which he had been assigned.

In December of 2005, Plaintiff was suspended from the Department for a ten-day period. This suspension was issued by Defendant Quagliani pursuant to a report written by Plaintiff's supervisor. The stated reason behind the suspension was the Plaintiff's late filing of several police reports, as well as the manner in which Plaintiff had investigated eight specific cases that had been assigned to him as an SVU Detective. This suspension was later unanimously overturned by a panel of the Connecticut State Department of Labor's Board of Mediation and Arbitration after a hearing and inquiry. The panel's accompanying report included a strongly worded critique of the initial Department decision to suspend Plaintiff, as well as a reference to "other problems raised in this case of a political nature which [the panel] found to be improper on the part of the West Haven Police

Department." [Doc. 32] Ex. 7, at 3-4.

In March of 2006, Plaintiff, along with another police Detective, was found by those Defendants who were members of the West Haven Board of Police Commissioners (i.e., all Defendants excepting Quagliani) to have mishandled a bomb threat at the West Haven High School at which both Plaintiff and the other Department employee worked as police liaisons. This finding was made pursuant to a Board hearing, and its immediate result was a decision to demote the Plaintiff from his then-position of Detective Grade A to Patrolman Grade A. Following an arbitration settlement, this demotion was later reduced to a 45-day duration.

Plaintiff claims that the acts of each Defendant were intentional, inspired by malice, and related to Plaintiff's support for a particular mayoral candidate. Plaintiff further claims that as a direct and proximate result of these acts, he suffered "anxiety, humiliation, loss of reputation in the community, ascertainable economic loss and the violation of his rights under the First Amendment to the United States Constitution." [Doc. 30] at 4.

Each individual Defendant has filed sworn answers to discovery interrogatories propounded by Plaintiff, denying Plaintiff's claims. With the exception of Quagliani, Defendants swear that they were not aware in 2005 that the Plaintiff was on the Democratic Town Committee. [Doc. 27] Ex. A at 4. All Defendants deny having any knowledge about who Plaintiff endorsed or for whom Plaintiff voted during the 2005 West Haven mayoral election. *Id.* at Ex. E. Defendants also plead two affirmative defenses. The first affirmative defense Defendants raise is that the claims and allegations set forth by the Plaintiff, "even if taken as true, do not state a claim for relief under 42 U.S.C. §§ 1983 or 1988, as any deprivation ... therein does not rise to the level of a constitutional tort." [Doc. 10] at 4. The second affirmative defense Defendants raise is that their "acts and conduct

4

... to the extent that they occurred as alleged ... were discretionary acts which were undertaken in good faith performance of their official duties as municipal officers, without malice" and, moreover, were "reasonable under the circumstances of which [Defendants] were aware [and] did not violate any clearly established constitutional rights of [Plaintiff]." *Id.*  As such, Defendants contend that they "have a qualified immunity defense from all liability therefor." *Id.*

## II.    Standard of Review

The standards for summary judgment are familiar.  Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  When ruling on a summary judgment motion, the court must construe the facts in evidence in the light most favorable to the nonmoving party.  It must also resolve all ambiguities and draw all reasonable inferences against the moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255.

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir. 1991).  A nonmoving party, such as the Plaintiff in this case, must therefore present affirmative evidence in order to defeat a properly supported motion for summary judgment.  When "a motion for summary judgment is properly supported by documentary and testimonial evidence ... the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but rather must present significant probative evidence to establish a genuine issue of material fact."  *Marczeski v. Gavitt*, 354 F.Supp. 2d 190, 193 (D. Conn. 2005) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986)).  To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return

a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.

Should the nonmoving party fail to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, summary judgment against him is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. at 322.  A "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23. If the nonmoving party submits evidence that is "merely colorable," summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249-50.  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48.

## III.    Elements of a First Amendment Retaliation Claim

In order to survive a motion for summary judgment on a First Amendment retaliation claim, a plaintiff who is a government employee must present evidence which demonstrates: (1) that the speech at issue was protected; (2) that the plaintiff suffered an adverse employment action; and (3) that there was a causal connection between the allegedly protected speech and the adverse employment action.  *See, e.g., Everitt v. DeMarco*, 704 F.Supp. 2d 122, 129 (D. Conn. 2010); *Cotarelo v. Village of Sleepy Hollow Police Department*, 460 F.3d 247, 251 (2d Cir. 2006) (quoting *Diesel v. Town of Lewisboro*, 232 F.3d 92, 107 (2d Cir. 2000)); *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003).  The causal connection between the speech and the adverse employment action "must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action." *Cotarelo v. Village of Sleepy Hollow Police Department*, 460

F.3d at 251 (quoting *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir. 1994)).[3]

---

[3]   Defendants claim that in addition to these elements, there exists a fourth requesite element that a public employee need prove in order to successfully make a First Amendment retaliation claim:  that a court find that the defendant's alleged retaliation actually chilled the plaintiff's exercise of his or her First Amendment rights.  For example, in [Doc. 27-1] Defendant's Motion for Summary Judgment, Defendants write that "[a] fourth element that the Plainitff must prove in order to prevail [in the case at bar] is that the Defendants' actions chilled the exercise of the [P]laintiff's First Amendment rights." [Doc. 27-1] at 11.  Defendants also include a subsection of this Brief entitled: "The Plaintiff has not presented sufficient evidence to create an issue of fact as to the actually chilled element of his First Amendment claim." *Id.*

Defendants' claim is inapposite.  Established case law demonstrates that the requirement of a "chilling effect" is not in fact applicable to the multi-part test by which a government employee's First Amendment retaliation claim is evaluated.  While it is true that a *private citizen*, in order to make a First Amendment claim, must show: (1) that he has an interest protected by the First Amendment; (2) that defendants' actions were motivated or substantially caused by his exercise of that right; and (3) that *defendants' actions effectively chilled the exercise of his First Amendment right*, this test is readily distinguished from that for a public employee who alleges First Amendment retaliation, the elements of which are enumerated in the text *supra*.

In *Everitt v. DeMarco*, 704 F.Supp. 2d 122 (D. Conn. 2010), this Court analyzed the distinction in a thoughtful opinion by Judge Bryant:

The elements of a First Amendment retaliation claim are dependent on the "factual context" of the case.  A public employee who alleges First Amendment retaliation must prove the following: (1) the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest; (2) he or she suffered an adverse employment action; and (3) the speech was at least a substantial or motivating factor in the adverse employment action.  *A private citizen, on the other hand*, must show: (1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) *defendants' actions effectively chilled the exercise of his First Amendment right*.

*Id.* at 129-30 (emphasis added, internal quotation marks and citations omitted); *see also Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) (concerning a *private citizen* who brought a First Amendment retaliation claim).  The Court further notes that *Marczeski v. Gavitt*, the 2005 District of Connecticut case to which Defendants primarily cite in order to support their proposition that this Court must consider whether Plaintiff's actions have been chilled in the case at bar, concerned a *private citizen* who sued two members of the New London Police Department, and not a government employee.  354 F.Supp. 2d 190, 191 (D. Conn. 2005).

Accordingly, in its evaluation of whether summary judgment is appropriate in the case at

Even if a plaintiff succeeds in showing these factors, his or her employer may nonetheless escape liability and prevail on a motion for summary judgment if the employer is able to establish that the same adverse employment action would have occurred "even in the absence of the protected speech."  *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977); *Sullivan v. Stein*, 487 F. Supp. 2d 52, 85 (2d Cir. 2007) ("Even if the plaintiff demonstrates these factors, the defendant can still prevail on a motion for summary judgment if it can show that it would have taken the same adverse ... action even in the absence of the protected conduct.") (quoting *Cotarelo v. Village of Sleepy Hollow Police Department*, 232 F.3d at 252); *Blum v. Schlegel*, 18 F.3d at 1010.[4]

## A.     Protected Speech or Expression

As stated *supra,* the first element that must be satisfied in a successful First Amendment retaliation claim made by a government employee is a showing that the speech or expression in question was in fact protected.  For an employee's speech to have been protected, a court must find that the employee spoke as a citizen on a matter of public concern.[5]  *Garcetti v. Ceballos*, 547 U.S.

---

bar, the Court does not consider or address those aspects of Defendants' briefing that pertain to whether Defendants' allegedly retaliatory behavior had any chilling effect on Plaintiff's actions.

[4] A government employer may also avoid liability for First Amendment retaliation if the employer can show "that the plaintiff's expression was likely to disrupt the government's activities, and that the likely disruption was sufficient to outweigh the value of the plaintiff's First Amendment expression."  *Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004) (citations omitted).  As this latter means of avoiding liability is inapplicable with regard to in the instant case, the Court does not address it further.

[5] While public employees "do not surrender their First Amendment rights to comment on matters of public interest by virtue of their acceptance of government employment," when "playing the role of employer, the state possesses greater leeway to control employees' speech that threatens to undermine its ability to perform its legitimate functions."  *Cobb v. Pozzi*, 363 F.3d 89, 101 (2d Cir. 2004) (quoting *Lewis v. Cowen*, 165 F.3d 154, 161 (2d Cir. 1999) and

410, 418-20 (2006); *Frank v. Relin*, 1 F.3d 1317, 1328 (2d Cir. 1993). If the court cannot make such a finding, the plaintiff has no First Amendment cause of action based on his or her employer's alleged reaction to the speech. *Connick v. Myers*, 461 U.S. 138, 147 (1983); *see also, e.g., Garcetti v. Ceballos*, 547 U.S. at 418-20. "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, ... a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick v. Myers*, 461 U.S. at 147. Thus in order to "make out a prima facie case on such a claim," a government employee "must ... establish first that [his or] her speech can be fairly characterized as constituting speech on a matter of public concern." *Frank v. Relin*, 1 F.3d at 1328; *Cotarelo v. Village of Sleepy Hollow Police Department*, 232 F.3d at 252 (citing same).

Speech is considered to deal "with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community." *Snyder v. Phelps*, 131 S. Ct. 1207, 1216 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). In deciding whether an individual's speech is of public or private concern, the court must examine the "content, form, and context of that speech, as revealed by the whole record." *Id.* at 1211 (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985) (internal quotations removed)). In considering these factors, "no factor is dispositive, and it is necessary to evaluate all aspects of the speech," *id.,* thereby balancing the interest of the employee "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in

---

citing *Pickering v. Bd. of Educ. of Township High School District 205*, 391 U.S. 563, 568 (1968) (internal quotations omitted)); *see also, e.g., Garcetti v. Ceballos*, 547 U.S. 410, 418-20 (2006).

promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ. of Township High School District 205*, 391 U.S. 563, 568 (1968).

The speech at issue in the case at bar concerns Plaintiff's activities on the West Haven Democratic Town Committee, specifically a vote that Plaintiff cast as a member of this Committee to endorse a particular candidate for mayor over the incumbent, to whom Plaintiff contends the Defendants remained loyal, and other expressions of support Plaintiff purportedly made.  Amended Complaint [Doc. 30] at ¶¶ 1, 12, 15.

Plaintiff asserts that "[b]y nominating and supporting a political candidate, [he] was exercising his sacred rights as an American to associate with a political party and participate in the democratic process."  Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment [Doc. 32] at 9.  The Court agrees with this contention, and concludes that both casting a political vote and generally supporting a particular political candidate are without question matters of public concern.  *See generally, e.g., Gronowski v. Spencer*, 424 F.3d 285, 292-93 (2d Cir. 2005).  The Court also finds that by conducting himself in this manner, Plaintiff was acting as a citizen.  Plaintiff satisfies the first element of a First Amendment retaliation claim.

Defendants in fact *admit* that "the Plaintiff, as a private individual in his private time, has a constitutionally protected right to support a political candidate." [Doc. 28] at 27.  However, somewhat perplexingly, Defendants appear to argue that if the Plaintiff did not discuss politics at work, then his speech did not merit protection.  In [Doc. 40] Defendants' Reply to Plaintiff's Opposition to Motion for Summary Judgment, Defendants state: "In Plaintiff's own words, he did not discuss politics at work, nor did he discuss matters of public concern at work.  As such ... the Plaintiff has failed to establish that his First Amendment claim involves a matter of public concern,

10

rather than an attempt to address his own personal grievances." [Doc. 40] at 7-8.  Even a cursory survey of U.S. Supreme Court decisions, however, shows that First Amendment protections for public employees may indeed apply to employee speech made *inside or outside* of the workplace, assuming the appropriate elements are present.  *See, e.g., Pickering v. Bd. of Educ.*, 391 U.S. 563 (in which the relevant speech was a teacher's *letter to a local newspaper* addressing issues including the funding politics of the teacher's school board); *Garcetti v. Ceballos*, 547 U.S. at 420 (which unequivocally states that "[e]mployees in some cases may receive First Amendment protection for expressions made at work," thereby implying that they also receive these protections *outside* of work.).

To the extent that Defendants are claiming that Plaintiff's constitutionally protected expression must have taken place in the workplace to merit the protections at issue here, the Court accordingly disagrees.[6]

### B.      Adverse Employment Action

The Second Circuit has defined an adverse action in a First Amendment retaliation case as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from

---

[6] The Court also disagrees with Defendants' apparent argument that because (as Defendants seem to assert) Plaintiff's speech was supposedly connected with his official job duties – Defendants do not specify in what way this might have been the case – Plaintiff was therefore not speaking as a citizen for purposes of First Amendment protections.  *See* [Doc. 45] Summary of Authority Supplementing Defendants' Motion for Summary Judgment.  While the Court without hesitation agrees with Defendants that case law has well established that a public employee's speech made *pursuant* to his or her official job duties is not constitutionally protected – *see, e.g., Garcetti v. Ceballos*, 547 U.S. 410 (2006) – the Court does not find this fact, or that line of case law, to be relevant to the case at bar in any cognizable way**.**  Neither Defendants' nor Plaintiff's briefing states any fact that could possibly tie Plaintiff's casting a vote in favor of a particular mayoral candidate, or Plaintiff's expressions and actions of support for that candidate, or, for that matter, Plaintiff's very membership on a local political committee, to Plaintiff's official duties as a West Haven Police Detective.

exercising his or her constitutional rights." *Washington v. County of Rockland*, 373 F.3d 310, 320 (2d. Cir. 2004) (internal quotation marks omitted).  Accordingly, a plaintiff need not demonstrate a material change in employment terms or conditions in order to establish that he was subjected to an adverse employment action so long as the plaintiff is able to show that "the retaliatory conduct in question would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Otte v. Brusinski*, 440 Fed. Appx. 5, 7 (2d Cir. 2011) (citations and internal quotation marks omitted).

In the past, courts have understood adverse actions in the First Amendment context to include threats involving administrative disciplinary proceedings as well as suspensions without pay, reasoning that because such actions could have a deterrent effect on other employees who wish to behave in similar ways, they ought to be considered adverse for purposes of examining and ruling upon a First Amendment retaliation claim.  *See, e.g., Washington v. County of Rockland*, 373 F.3d 310, 320-21 (2d Cir. 2004).

In the case at bar, the Court finds that the disciplinary actions taken against Plaintiff Vinci, including demotions and suspensions without pay, clearly constitute adverse actions within this rubric, as they would without doubt deter a similarly situated individual from expressing his or her own constitutional rights, assuming *arguendo* that such an individual associated these adverse actions with Plaintiff's protected speech or expression.

### C.    Causal Connection

The essence of Plaintiff's claim is that the disciplinary actions taken against him were the result of – i.e., motivated and caused by – the Defendants' retaliation for his support of Picard as a West Haven mayoral candidate in the 2005 election.  According to Vinci's deposition, he first

manifested that support in the spring of 2005, when Vinci attended a meeting of the Democratic Town Committee, joined the Committee for the first time, and at the same meeting cast a vote to endorse Picard as the party's mayoral candidate (the meeting took the form of a caucus).  Thereafter, Vinci displayed a sign for Picard in front of his home, performed routine and low-profile services at campaign headquarters, and voted for Picard in the general election.  Plaintiff contends that these actions on his part led the Defendants to retaliate against him.  He lays particular stress upon his vote for Picard during the Committee caucus.

As discussed *supra*, Vinci's vote to endorse Picard is a form of protected speech under the Constitution; so is his support of Picard during the campaign; and the subsequent disciplinary actions against him may be characterized as adverse employment actions.  The first two elements of a First Amendment retaliation claim are accordingly satisfied.  The case thus turns upon the third element, which requires Vinci to prove that there was a causal connection between the protected speech and the adverse employment action.  To restate that proposition:  In the absence of any direct evidence that Defendants retaliated against Vinci because of his vote for and support of Picard (and the record contains none), Vinci's ultimate burden is to produce evidence admissible at a trial which is sufficient to warrant an inference by the jury that the protected speech was a substantial moving factor in the adverse employment action.

In order to prove the third element of a First Amendment retaliation claim, a government employee plaintiff must establish "a causal connection between defendants' allegedly retaliatory conduct and [the plaintiff's] protected speech."  *Washington v. County of Rockland*, 373 F.3d 310, 320-21 (2d Cir. 2004).  Notably, while a government employee pleading a First Amendment retaliation action "can establish the causal connection between protected expression and an adverse

employment determination indirectly by showing that the protected activity was followed [either] by adverse treatment in employment, or directly by evidence of retaliatory animus," courts in this Circuit nonetheless have held that a plaintiff may *not solely* "rely on conclusory assertions of retaliatory motive to satisfy the causal link." *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004) (citing *Morris v. Lindau*, 196 F.3d 102, 110-11 (2d Cir. 1999) (abrogated on other grounds) (internal quotations omitted)).   A plaintiff must therefore provide the Court with "*some tangible proof* to demonstrate that [his] version of what occurred was not imaginary." *Id*.   (emphasis added). "[W]ide-ranging speculation about what may have motivated" a defendant employer to act is, "[w]ithout some proof in the record [of] retaliatory animus toward" the plaintiff and without any "evidence to contradict [a defendant's] testimony" to the contrary, simply insufficient to make a First Amendment retaliation claim. *Deters v. Lafuente*, 368 F.3d 185, 190 (2d Cir. 2004)

The case of *Washington v. County of Rockland* is instructive.   There, the Second Circuit held that plaintiffs, employees of a sheriff's department, could not succeed in making out a First Amendment retaliation claim based upon defendants' decision to file administrative disciplinary charges against plaintiffs, stating that "although plaintiffs suffered an adverse employment action, their retaliation claim fails nonetheless because they did not demonstrate a causal connection between the adverse employment action and the protected speech." 373 F.3d at 313. The Second Circuit specified that in order "to satisfy the causal connection requirement of the prima facie case, plaintiffs must show that their" protected speech was "a substantial motivating factor" in the department's decision to initiate administrative disciplinary charges against them. *Id.* at 321 (citations omitted).   In order to do so, the plaintiffs needed to "*aver some tangible proof* demonstrating that their protected speech animated [the sheriff's department's] decision to initiate

14

disciplinary charges," and could "not rely on conclusory assertions of retaliatory motive." *Id.* (emphasis added, internal quotations and citations omitted.). Accordingly, "[a]bsent some record evidence that" the sheriff's department "and its officials possessed retaliatory animus toward them," the Court of Appeals held that there was insufficient evidence for a finding of First Amendment retaliation, and the plaintiff's claim was rejected. *Id.*

Similarly, in the case of *Mangiafico v. Blumenthal*, decided five years ago by this Court, the plaintiff, a department of corrections captain named Sebastian Mangiafico, claimed that he was retaliated against after telling his department's Deputy Commissioner that he intended to file a lawsuit against the Connecticut State Attorney General with regard to a denial of legal representation for a work-related incident. 2007 WL 283115 at *7 (D. Conn. Jan. 30, 2007). While Mangiafico alleged that the Deputy Commissioner relayed this message to the department Commissioner, the Deputy Commissioner denied in sworn testimony that Mangiafico had ever told him of his intent to sue. On this record, the Court concluded that any allegation that the Deputy Commissioner relayed such a message to the Commissioner would be no more than "rank speculation." *Id.* The Court likewise found Mangiafico's alternative argument, that the department Commissioner would have learned of Mangiafico's lawsuit against the Attorney General through workplace "rumor mills," to be "similarly speculative." *Id.* The Court further held that the argument that a causal connection could be found due to the timing of the plaintiff's transfer – i.e., which took place only days after the plaintiff filed his lawsuit – "could not be mere coincidence" had not been supported by any "tangible proof" that the Commissioner even knew of Mangiafico's lawsuit prior to her decision to transfer him to another facility. *Id.*

Given the evidence provided and the allegations made in the case at bar, the third element

of causal connection breaks down into two sub-questions.  First: Did a particular Defendant either know that at the caucus meeting of the Democratic Town Committee in 2005, Vinci voted to endorse Picard or that, subsequent to that vote, Vinci was supporting Picard's candidacy?  Second: Was that knowledge a substantial moving factor in a Defendant's subsequent subjecting of Vinci to disciplinary proceedings?  The second question does not arise unless the first question is answered in the affirmative.  After reviewing the evidence provided by both parties, the Court finds, as with the nature of the causal evidence provided in *Washington* and *Mangiafico*, that Plaintiff has simply not provided sufficient evidence that there is a causal link between the adverse employment actions he alleges he has suffered and his activities on the West Haven Democratic Town Committee, specifically his voting for and otherwise supporting the mayoral candidacy of John Picard.

The Court takes note that Plaintiff's 2005 ten-day suspension was overturned, and that following a hearing, an inquiring panel at the State of Connecticut Department of Labor's State Board of Mediation and Arbitration issued a report stating that it had "unanimously [found] that [Plaintiff] should not have been suspended for ten days without pay," that "[t]here were a substantial number of cases which were offered as evidence that supported the ... position that [Plaintiff] had been treated unfairly in this matter," and, as well, that "there were other problems raised in this case of a political nature which [the panel] found to be improper on the part of the West Haven Police Department." [Doc. 32] ex. 7, at 3-4.  Assuming without deciding that this report would be admissible at trial as a "public record," *see* F.R. Evid. 803(8), its vague and undefined reference to "problems ... of a political nature" is not probative of Plaintiff's theory that he was retaliated against specifically because of his vote for, or his support of, Picard.  Furthermore, the report states that after these  "problems ... of a political nature" arose, Vinci "immediately went to [Defendant Quagliani]

16

and resolved them without further ado," *id.* at 4, suggesting that there is no connection between whatever problems were "resolved" and the facts giving rise to this action.

The Court also notes that both of the adverse incidents occurred subsequent to Plaintiff's averred support of Picard, and takes note of Plaintiff's reported contentions (unsupported by any other evidence submitted to the Court) that at least two other Department detectives, both of whom Plaintiff believes did know how Plaintiff had voted in the spring of 2005 Committee mayoral caucus, had warned Plaintiff to be careful "because politics can get [someone] into trouble," and that Plaintiff should "watch [his] back" and "be careful," respectively, [Doc. 32] Ex. 1 at 64-66, as well as the fact that Plaintiff testifies that generally "there [were] a lot of comments" within the Department "that there [were] going to be problems." *Id.* at 64-65.

However, without presenting any evidence beyond Plaintiff's own reports and accounts of departmental rumors and varying degrees of speculation and likelihood that Defendants were *even aware* of which candidate Plaintiff supported for the 2005 West Haven mayoral election, much less that Defendants' adverse actions *arose out of* such support on the part of Plaintiff or were *primarily motivated* by such support, Plaintiff has not presented enough evidence under the legal standards set forth by prior case law for a First Amendment retaliation claim to survive Defendants' motion for summary judgment. As in the cases of *Washington* and *Mangiafico*, this Court is constrained to conclude that the evidence presented in support of Plaintiff's claim is too tenuous, too conclusory, and ultimately too lacking in "tangible proof."

Perhaps not surprisingly, Defendants' own testimony does not assist Plaintiff in any way. Defendant Quagliani states under oath in an interrogatory answer that he "never knew who [Plaintiff] supported, endorsed, or voted for in the 2005 West Haven mayoral election" and that he "was never

17

aware of [Plaintiff's] vote at the Democratic Town Committee." [Doc. 27] Ex. E at 3. These claims are echoed by Defendants Thomas Gallagher, *id.* at 6, Grace Hendricks, *id.* at 9, Richard K. Smith, *id.* at 12, and Lisa Whitney Yarbor, *id.* at 16. Indeed, all Defendants except Quagliani swear that in the relevant time period they did not even know that Vinci was a member of the Committee. But that is not the main point. The main point is that if Defendants did not know how Vinci voted or which mayoral candidate Vinci was supporting, they cannot be said to have retaliated against him for casting that vote or for giving that support.

Such "interrogatory answers" may be considered on a motion for summary judgment. Fed R. Civ. P. 56(c)(1)(A). Defendants offer these answers to demonstrate that "there is no genuine dispute as to [the] material fact" of causal connection, and that they are "entitled to judgment as a matter of law" dismissing Plaintiff's retaliation claim. Fed R. Civ. P. 56(a). Plaintiff's opposition to that motion, thus supported, "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed R. Civ. P. 56(c)(4).

While Plaintiff claims that several of the Defendants knew of his vote for Picard in the Committee caucus and general mayoral elections, his assertions are conclusory at best. Even if some of the Defendants were present at the caucus at which Plaintiff cast his vote, this does not mean that they heard and noted for whom Plaintiff was voting. Further, even if some or all of the Defendants were aware of who Plaintiff supported in the 2005 West Haven mayoral campaign, Plaintiff has not produced any evidence that there was animus toward him on those grounds – or, for that matter, that Defendants themselves even supported Picard's opposition. Indeed, the testimonial evidence Plaintiff relies upon to oppose Defendants' summary judgment motion consists principally of his own

deposition, taken by counsel for Defendants.  Selected pages from this deposition transcript were submitted with the parties' briefs.  The Court has considered Plaintiff's testimony in its entirety.  That testimony falls well short of establishing that a genuine dispute exists with respect to the existence *vel non* of a causal connection between Vinci's vote to endorse Picard and the West Haven Police Department's subsequent disciplinary actions against him.

Vinci testified that he had become dissatisfied with the administration of West Haven's multi-term mayor, Richard Borer, and thought there should be a change.  Vinci favored John Picard for that office.  Both Borer and Picard were registered Democrats.  The West Haven Town Democratic Committee held a meeting and caucused during the spring of 2005 to endorse its candidate for the general election in November.  Vinci, who had not previously been active in local politics, decided to join the Committee.  A few weeks to a month before the spring 2005 Committee meeting, Vinci informed Police Chief Ronald Quagliani, a Defendant in this action, of that intention.  Quagliani had no objection to Vinci joining the Town Democratic Committee "as long as it's not going to interfere with your job," which Quagliani did not foresee: according to Vinci's testimony, Quagliani said to him, "'Yeah, you endorse certain candidates,' something like that, 'But I don't see a problem.'  And that was basically the extent of our conversation."  Tr. 25-26.[7]  Vinci did not testify then, and does not contend now, that he told Quagliani during that meeting of his intention to vote for Picard over Borer for mayor.

Vinci attended the spring meeting of the Town Democratic Committee and became a member during that meeting.  The Committee held its caucus at the meeting and Vinci participated, casting his vote for Picard.  Asked if he had previously expressed a preference for Picard over Borer, Vinci

---

[7]  References are to the transcript of Vinci's deposition, conducted on January 29, 2010.

testified: "Not that I can recall." Tr. 27. Vinci acknowledged that he knew he was going to vote for Picard before he became a member of the Committee during the caucus meeting; Defendants' counsel then asked Vinci: "Did you talk about that with anybody at the police department, that you knew you were going to support whoever was running against [Borer] because it was time for a change?" And Vinci responded: "No, I don't discuss politics at work." Counsel (following up): "Ever?" Vinci: "No. I don't make phone calls. I don't do that stuff at work." Tr. 40-41.

Given that testimony, Defendants' counsel asked Vinci for the basis of his contention that "anybody at the police department knew who it was that you supported in the election." Tr. 41. Vinci's response, in substance, was that a police officer named Brian Reilly and Grace Hendricks, a Police Commissioner and a Defendant in the action, were present at the meeting and could have seen Vinci cast his vote for Picard. Tr. 41-42. Subsequently, Defendants' counsel put it to Vinci that a comment by Reilly later in the campaign established that Reilly "either wasn't there or wasn't paying attention to who you voted for at the caucus, because he didn't even know you were on the Democratic Town Committee; fair to say?" Vinci responded: "Yes." Tr. 48. As for Hendricks, she has sworn under oath in her responses to Interrogatories 1 and 2 that: "I never knew the plaintiff was on the Democratic Town Committee in 2005" and "I never knew who the plaintiff supported, endorsed or voted for in the 2005 West Haven mayoral election." There is no evidence directly contradicting those denials. As Vinci's testimony about Reilly shows, accepting that Hendricks was present at the Committee caucus (which is open to the public, Tr. 43), that presence is not inconsistent with a lack of awareness on her part of how another individual voted in endorsing a candidate.

Vinci testified that after the Committee chose Picard as the Democratic mayoral candidate,

Borer ran as an independent.  During the general campaign, Vinci performed routine and low-profile tasks at the Democratic/Picard headquarters: making phone calls, stuffing envelopes, helping with mailings.  Tr. 48-49.  While such relatively modest political activity is sufficient to identify Vinci to some extent within the greater West Haven community as a Picard supporter, it is not probative of any Defendant's knowledge of Vinci's caucus vote for Picard over Borer, or an intent to retaliate against Vinci either because of that vote or because of Vinci's endorsement of Picard.

That vote is central to Vinci's retaliation claim against these Defendants, as this deposition testimony shows:

> Q.    Is it your contention from your complaint that your First Amendment right of free speech was abridged by the discipline taken against you?
>
> A.   Yes.
>
>
> Q.   What speech is it that you made that you were retaliated against for?
>
> A.   I feel that I have the right to vote for who I feel that I think would be doing the right thing for the city.  And I feel that I thought the new person would do a good job for the City of West Haven.  And when I made that historic vote and ousted the seven-year incumbent, that I was retaliated against soon after.
>
> Q.   So the speech is the vote you made at the caucus, right?
>
> A.   I am sorry, did I say speech?
>
> Q.   Well, the First Amendment protects freedom – free speech.  And I am asking – so it can conduct.  So I am asking: What action is it that you took that you believe you were retaliated against for?  And the action was the vote, right?
>
> A.   Yes.

> Q.   It's not like you were discussing matters of public concern at work, for instance, correct?
>
> A.  No.
>
> Q.  Is that correct?
>
> A.  That's correct, yes.

Tr. 74-75.

During this testimony, some momentary confusion arose because Vinci, a layman, did not immediately grasp the constitutional concept familiar to lawyers that a *vote* is a form of protected *speech*.  However, the theory of Plaintiff's retaliation claim is entirely clear: Vinci claims the disciplinary actions against him were intended by Defendants to retaliate for Vinci's caucus vote (an "historic" vote, in Vinci's perception) to endorse Picard over Borer, the "seven-year incumbent."  The difficulty for Vinci in opposing Defendants' summary judgment motion lies in the failure of his deposition testimony to furnish any evidence that any Defendant knew how Vinci had voted on that occasion.  Each Defendant swears that he or she did not know.  To be sure, those denials standing alone are not determinative of the issue, but they constitute admissible evidence on a key element of the claim, and have the effect under Rule 56 practice of putting Vinci to his proof on the question of Defendants' knowledge (on which the ultimate question of causal connection depends).

The conclusion to which Vinci's deposition testimony inextricably leads is that the catalyst for his retaliation suit may be found in comments made to him by others: friends, colleagues, acquaintances.  Indeed, Vinci's deposition testimony shows that the principal, perhaps the only, catalyst for his retaliation action lies in remarks made to him by others (not by any Defendant) after Vinci's vote for Picard at the caucus meeting.  He testified: "There was a lot of comments made after

I did that, after I made that vote in the spring of '05 that there was going to be problems.  A lot of people were talking about that."  These were people at work with Vinci.  Q. By counsel: "So work people said things about the fact you were going to have problems because of your caucus vote?"  A.  "Yes.  People got back to me and were saying things, yes. . . . . a lot of people. . . . A detective that sits right next to me, Detective James Sweetman. . . . He said to me, 'Just be careful.  Be careful because, you know, politics can get you into trouble.'. . . . There was other people. . . .  People were calling my house."  One of these was a detective, Joseph Vecellio.  He called after the caucus vote and, as Vinci reported: "Just told me to watch my back, be careful."  Tr. 64-68.  Sweetman and Vicellio were the only two "friendly cautioners" whose names Vinci could recall at his deposition.

One may accept this testimony in its entirety: It is of no legal consequence on this motion, for two reasons.  First, the cautionary notes sounded by Vinci's well-wishers, known or anonymous on this record, fall well short of evidencing any particular Defendant's knowledge that Vinci voted for Picard at the caucus, or an intent to retaliate based upon that knowledge.  Accordingly, those declarations are insufficient to contradict the Defendants' sworn denials that they possessed such knowledge.  Second, even if these declarations by other individuals could be construed as probative of a Defendant's knowledge or intent, Vinci could not testify about them at a trial because the declarations, offered for the truth of their assertions that Vinci was in political trouble because of his vote, would constitute inadmissible non-party hearsay.  As we have seen, a party opposing his adversary's properly supported motion for summary judgment must submit evidentiary material that would be admissible at the trial.

Thus, although Vinci has manifestly suffered adverse employment actions, and although the speech at issue is doubtlessly protected by the First Amendment, Vinci has not demonstrated a causal

23

connection between the adverse employment action and the protected speech.  The standards for summary judgment are clear: the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247-48, and, furthermore, the "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. at 322-23.  In the case at bar, the Plaintiff, the nonmoving party, has submitted evidence that at the very most is "merely colorable;" accordingly, summary judgment may be granted to the Defendants.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249-50.  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Id.* at 247-48.  This analysis applies equally to all arguable aspects of Plaintiff's claims, be they viewed as claimed retaliation for freedom of speech or for freedom of association.

The Court does not doubt the sincerity with which Plaintiff asserts that Defendants' disciplinary actions against him were wrongful, or that those actions caused Plaintiff great distress.  However, the law requires that a claim for wrongful retaliation be established by proof of each of the elements discussed in this Ruling.  There is a reason for that requirement of proof:  A public servant's right to be free from retaliation by his or her superiors for exercise of constitutional rights must be balanced against the rights of those other servants of the public interest to be free from unproven or unprovable accusations of wrongdoing.

Having carefully considered the record in this case, and having viewed that record in the light of governing Supreme Court and appellate court decisions, this Court concludes that the Defendants' motion for summary judgment must succeed.  Given that conclusion, the Court need not and does

not reach arguments concerning whether Defendants may claim qualified immunity or any other affirmative defense.

**IV.     Conclusion**

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. 27] is GRANTED in all respects.

The Clerk is directed to enter judgment in favor of the Defendants and each of them, and against the Plaintiff, dismissing the complaint with prejudice, and to close the case.

It is SO ORDERED.

Dated: New Haven, Connecticut
September 7,  2012

                                        /s/ Charles S. Haight, Jr.              _
                                        Charles S. Haight, Jr.
                                        Senior United States District Judge